# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| L.C. JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 4684 |
| v. ) | |
| ) | Hon. Charles R. Norgle |
| TERRY McCANN, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, a former state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that the defendants, officials at the Stateville Correctional Center, violated the plaintiff's constitutional and statutory rights by failing to accommodate his religious beliefs and by denying him equal protection. More specifically, the plaintiff alleges that the defendants compelled him to cut off his dreadlocks, under threat of force and in violation of his Rastafarian faith, while permitting other inmates to grow their hair long. This matter is before the court for ruling on the defendants' motion for summary judgment. For the reasons stated in this order, the motion is granted.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Vision Church v.*

*Village of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Information Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

The defendants object, with good reason, to the plaintiff's response to their Local Rule 56.1 Statement of Facts. On March 3, 2010, the court admonished the plaintiff about summary judgment requirements and directed the clerk to mail the plaintiff copies of Fed. R. Civ. P. 56 and Local Rule 56.2 (N.D. Ill.) The court specifically highlighted what the plaintiff needed to do to contest the motion, particularly, the defendants' statements of uncontested facts. Despite this, the plaintiff has submitted

a response that is deficient in a number of respects. The plaintiff cannot simply dispute certain facts or elaborate on events in his opposing briefs. Unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.*, No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) (Pallmeyer, J.), *citing In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

Nevertheless, because the plaintiff is proceeding *pro se*, the court will consider the factual assertions he makes in his brief and unnotarized affidavits, but only to the extent that the plaintiff and his witnesses could properly testify about the matters asserted. Among other things, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. The minute facts of this case, in any event, are largely irrelevant; the principal thrust of this lawsuit is the legality of Stateville's grooming policy. The court therefore finds that any minor factual disputes are not outcome-dispositive.

## FACTS

The plaintiff was a state prisoner, confined at the Stateville Correctional Center at all times relevant to this lawsuit. (Complaint, p. 2.) Since the filing of the defendants' motion for summary judgment, the plaintiff has been released on parole; he currently resides in Dolton, Illinois. (Appearance Form, document no. 100; IDOC website.) The defendants are employees of the Illinois Department of Corrections, assigned to Stateville. (Complaint, pp. 2-2A.)

The following facts are uncontested for purposes of this motion:

The plaintiff was convicted of home invasion on or about April 26, 2007. (Defendants' Exhibit I, Deposition of L.C. Johnson, at p. 5.) The plaintiff arrived at Stateville's Northern Reception and Classification Center[1] on April 27, 2007. (*Id.*, pp. 7-8.)

The plaintiff is a Rastafarian. (Complaint, p. 6). Because the plaintiff's purported religious beliefs dictate that he not cut his hair, he wears it in dreadlocks. (*Id.; see also Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (summarizing Rastafarian doctrine).

Stateville has a grooming policy which prohibits hairstyles, including facial hair, "that present a health, sanitation or security risk as outlined in departmental policy." (Defendants' Exhibit B, Administrative Directive 05.03.160K3; Defendants' Exhibit A, Warden's Bulletin #02-60.) According to the Administrative Directive, a hairstyle or facial hair presents a security risk when: (1) the hair impedes or prevents staff from conducting a thorough search of the hair for contraband; (2) the hair is of such a volume or configuration that contraband hidden within the hair may not be detected; (3) the hairstyle is such that contraband hidden within may injure an employee who is

---

[1] In his materials opposing summary judgment, the plaintiff repeatedly emphasizes that Stateville NRC is a "transitional center" rather than the regular facility. Presumably, the plaintiff's point is that he had not yet been classified with any particular security designation. However, the court finds the matter to be a distinction without a difference. For purposes of screening and admission, it only makes sense that all new inmates are subject to Stateville's maximum security precautions pending a more considered review process before they are assigned to another prison.

searching it; or (4) the hairstyle signifies a security threat group affiliation. (Exhibit B, p. 1, Section II(B).)

The Administrative Policy outlines the procedures for addressing an inmate's refusal to comply with the grooming policy. If the offender refuses to comply with a request to cut his hair, a disciplinary report is written for disobeying a direct order. (*Id.*, p. 3, Sec. II(J).) A second attempt is then made within forty-eight hours to obtain compliance with the directive. (*Id.*) If the inmate still does not comply, a second disciplinary report is written and the inmate is given a second forty-eight hours to comply. (*Id.*, p. 4.)

A third attempt is then made. (*Id.*) If the plaintiff still refuses to comply, the chief administrative officer may order that the hairstyle be removed. (*Id.*) A tactical team enforces the order, securing the plaintiff in restraints, as necessary, while a staff barber cuts his hair so that it meets health, sanitation, and security concerns. (*Id.*)

Pursuant to the prison's grooming policy, the plaintiff was asked to have his hair cut on at least three separate occasions between April 30, 2007, and May 29, 2007. (Plaintiff's Dep. pp. 15, 16, 25; Defendants' Group Exhibit G, Disciplinary Reports.)

The first time the plaintiff was approached about his hair, defendant Hosey asked him about either cutting his hair or "taking [his] dreads down," in preparation for an x-ray. (Plaintiff's Dep., pp. 14-15.) The plaintiff responded, "These don't come down, they're permanent." (*Id.*, p. 15.) Hosey sent the plaintiff back to his cell, encouraging him to "see if you can get a comb and take them down." (*Id.*)

On May 22, 2007, the plaintiff refused an order from defendant Michel either to cut his hair or have it cut by a barber. (Defendants' Exhibit G; Defendants' Exhibit E, Affidavit of Philip Michel.) Michel believed that the plaintiff's hair presented a safety and security concern "as fingers could not be run through it freely." (Michel Affidavit, ¶ 8.) [The plaintiff disputes whether such an assumption can be made simply by looking at one's hair.] Michel assessed that the plaintiff's hair was not able to be manually searched, and he thought the hairstyle "could have been used to conceal weapons, drugs, needles, or other dangerous objects." (Id., ¶ 11.) Michel was personally aware of at least ten occasions where inmates have hidden contraband in their hair. (Id., ¶ 9.) According to Michel, "The Warden's Bulletin is not specific to any one religious group, and is applied to all inmates equally." (Id., ¶ 5.) Michel notes that many inmates have had their hair forcibly cut after receiving multiple direct orders to submit to a haircut voluntarily. (Id., ¶ 6.)

On May 24, 2007, defendant Nance issued the plaintiff a second disciplinary report for refusing a haircut. (Defendants' Exhibit G; Defendants' Exhibit F, Affidavit of Samuel Nance, ¶ 9.) No officer ever actually attempted to search the plaintiff's dreadlocks for contraband. (Plaintiff's Exhibit 4-D, Affidavit of L.C. Johnson.)

On May 29, 2007, the plaintiff was provided a copy of the Individual Grooming Policy Notice. (Defendants' Exhibit H.) The form described the grooming policy and outlined the consequences for failing to adhere to it. (Id.) The plaintiff signed the notice, which stated on its face that it constituted the "final written and verbal order."

(*Id.*) The plaintiff also indicated on the form that he would voluntarily consent to having his hair cut. (*Id.*) The plaintiff nevertheless asserts that he agreed to the haircut under duress. (Plaintiff's Exhibit 4-D, Affidavit.) The plaintiff says that he consented only because defendant Hosey threatened to use force, if necessary, to cut the plaintiff's hair.[2] *Id.*

On May 30, 2007, a prison adjustment committee found the plaintiff guilty of disobeying direct orders in connection with both disciplinary reports. (Defendants' Exhibit G.) The plaintiff asserts that the disciplinary proceedings were "defective" because no member of the facility program staff, such as a counselor or educator, served on the hearing committee.

At least one other Rastafarian inmate, Adama Njie, was allowed to maintain his dreadlocks while incarcerated at Stateville. (Plaintiff's Dep. p. 36.) Another inmate, Elie Bernal, had waist-length hair. (*Id.*) [However, a review of the IDOC website reveals that both Njie and Bernal currently have very close-cropped hair.] The plaintiff also observed inmates with "kinky, bushy and nappy afros" who were not required to cut their hair. (Plaintiff's Affidavit; *see also* Plaintiff's Exhibit 5-E, Affidavit of Curtis Thomas.) [Like Bernal and Njie, Thomas' identification photos on the IDOC website presently reflect very short hair.] A fellow Rastafarian, Jermaine Walker, was subjected

---

[2] As noted *supra*, Administrative Directive 05.03.160K3 specifically authorizes the intervention of a tactical team if an inmate refuses three orders to comply with the prison's grooming policy.

7

to a forced shearing of his dreadlocks. (Plaintiff's Exhibit 6-F, Affidavit of Jermaine Walker.)

## DISCUSSION

### A. Injunctive Relief

The plaintiff's claim for injunctive relief is now moot. The plaintiff's May 5, 2010, change-of-address notice indicates-and the IDOC's website confirms-that he has been paroled. A prisoner's request for injunctive relief in connection with an RLUIPA claim is rendered moot by his release from prison. *Koger v. Bryan*, 523 F.3d 789, 804 (7th Cir. 2008) (suit by inmate subscribing to Thelema religion who sought a meat-free diet was dismissed as moot to the extent that he sought injunctive relief). Allegations of possible re-transfer or re-incarceration may not be based on mere speculation. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (internal citations and quotations omitted). Furthermore, the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subject to the alleged illegality. *Id.; see also Young v. Lane*, 922 F.2d 370, 373 (7th Cir. 1991) ("Unaccompanied by any continuing, present injury or real and immediate threat of repeated injury, their past exposure to illegal conduct ... does not show a pending case or controversy requiring injunctive relief, and we must vacate as moot that portion of their prayer for relief.") Because the plaintiff is no longer incarcerated, he has no standing to seek injunctive relief.

## B. The Plaintiff's RLUIPA Claim

### 1. Overview of RLUIPA

The Religious Land Use and Institutional Persons Act (hereinafter, "RLUIPA"), 42 U.S.C. § 2000cc-1(a), prohibits prisons that receive federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden: (1) furthers a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. The defendants concede both that Stateville receives federal funding and that the grooming policy in question substantially burdened the plaintiff's religious exercise. However, the defendants have met their burden of persuasion that the grooming policy both furthers compelling governmental interests of health and security, and is the least restrictive means of doing so.

### 2. The Grooming Policy Furthers a Compelling Governmental Interest

Stateville's grooming policy furthers compelling governmental interests of prison safety, security, and sanitation. Courts are not to read RLUIPA in a manner that elevates accommodation of religious observances over an institution's need to maintain safety and security. *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). The Supreme Court has explained that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). Matters of penological security, discipline, order, and safety satisfy the RLUIPA "compelling governmental interest" standard. *Id.* at 723. In evaluating prison regulations under RLUIPA, the courts must give "due deference" to prison

9

officials, who are best equipped to assess the regulations and procedures necessary to maintain safety and security within the prison. *Ibid.*

After the defendants filed their motion for summary judgment, the U.S. Court of Appeals issued an unpublished opinion regarding the IDOC's grooming policy and its effect on Rastafarian inmates. *See Williams v. Snyder*, No. 08-1908, 2010 WL 75015 (7th Cir. Mar. 5, 2010). Although unpublished Seventh Circuit opinions are not binding and technically have no precedential value, the *Williams* decision is both less than two months old and directly on point. The Court of Appeals agreed that long hair in general, but particularly hair that is unkempt and growing wild, presents security risks to both prison officials and inmates alike. *Williams*, 2010 WL 75015 at *1. Dreadlocks are thick and coarse, and provide an ideal hiding place for contraband such as drugs, sharp plastic objects, needles, knives and makeshift blades, and even black thread (which can be coated in toothpaste and left to harden, creating handcuff-saws). *Id.* Drugs and weapons obviously have no place in a maximum security facility. Defendant Michel asserts in his affidavit that he personally knows of at least ten occasions where inmates have hidden contraband in their hair.

Another security concern is potential inmate conflict: one of the professed Rastafarian beliefs is that dreadlocks symbolize racial superiority. *Reed*, 842 F.2d at 962 (cataloguing the district court's findings). Like gang tattoos, dreadlocks carry the threat of stirring resentment from other groups. Moreover, "a mundane but important point

is that requiring prisoners to wear their hair short makes it harder for them to change their appearance, should they escape, by cutting their hair short." *Ibid.*

In addition to legitimate security implications, dreadlocks also raise health and safety concerns. Dreadlocks are "long, ropy, [and] matted." *Id.* at 961, citing *Rebels: The Rastafarians and the Free Exercise Clause*, 72 Geo.L.J. 1605, 1608 (1984). Long, knotted ropes of hair are difficult to wash thoroughly. Unclean hair increases the risk of infection and lice within a prison. *Reed* at 962. Furthermore, long hair has the potential to get caught in machinery or cell doors. *Ibid.* Health and safety are also compelling governmental interests.

The courts have been near-unanimous in upholding prison regulations regarding hair length. *See, e.g., Diaz v. Collins,* 114 F.3d 69, 73 (5th Cir. 1997); *Hamilton v. Schriro,* 74 F.3d 1545, 1552 (8th Cir. 1996) (both upholding prison regulations on hair length under the Religious Freedom Restoration Act, a predecessor to RLUIPA); *Thomas v. Winters,* No. 04-3049, 2006 WL 563035 (C.D. Ill. Mar. 8, 2006) (validating the same grooming policy against an RLUIPA challenge).

### 2. The Grooming Policy Satisfies the Least Restrictive Means Test

In his "Addendum" (document no. 88, page 6, at ¶ 4), the plaintiff seems to allow that the grooming policy furthers a compelling government interest; he focuses, instead, on his argument that the policy is not the least restrictive means for furthering safety and security. But as the Hon. Matthew F. Kennelly of this district observed, "As best as we can determine, every Circuit to address the issue has held that regulations of inmate

hair length satisfy the least restrictive means. test." *See Collins-Bey v. Briley*, Case No. 03 C 2779, Memorandum Opinion and Order entered October 25, 2004, *citing Diaz*, 114 F.3d 73; *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996); *Hamilton*, 74 F.3d at 1555; *see also Walker v. McCann*, Case No. 07 C 3083, Minute Order of February 5, 2009 (Bucklo, J.) (granting summary judgment on a nearly identical claim).[3] One might argue that regular individual inspections of inmates with long hair would prove a less restrictive means of maintaining prison security than blanket grooming policies like the one at issue in this case. Though such a policy would no doubt be less restrictive from the perspective of the inmates affected, it would not adequately address the legitimate safety concerns of prison officials.

The plaintiff contends that the grooming policy is not the least restrictive means of satisfying security needs; however, he offers no alternatives whatsoever, let alone reasonable alternatives. Individual, manual searches would be inferior to the general grooming policy for multiple reasons. First, given the large number of inmates at prisons like Stateville, requiring individual searches would enable inmates to hide contraband or weapons in their hair in-between inspections. Second, guards could be cut or otherwise injured in running their hands through hair that contained a sharp object.

---

[3]This court is nevertheless mindful of *Warsoldier v. Woodford*, 418 F.3d 992, 1002 (9th Cir. 2005), where a Native American challenged a ban on long hair. In reversing the denial of a motion for a preliminary injunction, the court found that conclusory statements in support of the hair grooming policy failed to demonstrate that the policy was the least restrictive means to ensure prison security. That court pointed out that multiple prison systems, including the Federal Bureau of Prisons and the departments of corrections in Oregon, Colorado and Nevada allowed religious exemptions to their grooming policy. 418 F.3d at 999.

Third, individual searches would strain the IDOC's limited resources by adding to correctional officers' already-full plate. Prison administrators may take costs and manpower into account when implementing regulations and procedures. *Cutter*, 544 U.S. at 723. Fourth, every occasion requiring close, physical contact between prisoners and guards raises the chance of violence occurring. *See also Rose v. Snyder*, No. 06-0102, 2007 WL 627456 (S.D. Ill. Feb. 27, 2007) (less restrictive alternatives would not suffice).

Other possible alternatives are equally ineffective. A metal detector would, of course, find only metal objects in hair, not drugs, plastic, glass, or thread. Self-administered searches by inmates would be inadequate because inmates could avoid "discovering" any contraband concealed in their hair. *Williams*, 2010 WL 750105 at *1. The court is satisfied that the grooming regulation is appropriately designed to minimize these valid concerns.

## B. The Plaintiff's First Amendment Claim

The defendants' grooming policy passes muster under the First Amendment because the haircut policy is reasonably related to a legitimate penological interest. If a challenged policy survives scrutiny under the more generous RLUIPA standard, the policy necessarily survives scrutiny under the First Amendment test as well. *Clark v. Briley*, No. 03 C 3852, 2005 WL 2369330, *5 (N.D. Ill. Sep. 26, 2005) (Kocoras, J.).

Correctional administrators must permit inmates a reasonable opportunity to exercise their religious freedom. *See, e.g., Tarpley v. Allen County, Indiana*, 312 F.3d

895, 898 (7th Cir. 2002), *citing Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972). Although inmates do not forfeit all First Amendment protections by virtue of their conviction, incarceration necessitates some withdrawal or limitation of many rights and privileges. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). A prison inmate retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Brookins v. Kolb*, 990 F.2d 308, 312 (7th Cir. 1993); *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

When a challenged prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is "reasonably related" to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004). Under *Turner*, the court must consider four factors in assessing whether a prison regulation is reasonably related to a legitimate penological interest: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. *Turner*, 482 U.S. at 89-90.

Based on the four factors set forth in *Turner*, 482 U.S. at 89-90, the court finds that the defendants are entitled to judgment as a matter of law on this issue. There is a valid and rational connection between the regulation and legitimate government interests behind the rule (security, health and safety, as discussed more fully *supra*). The plaintiff had an alternative means of exercising his rights: dreadlocks are only one aspect of Rastafarianism; the plaintiff remained free to read his Bible and observe other tenets associated with the religion, such as vegetarianism and abstaining from alcohol. Finally, the plaintiff has failed to postulate any practical alternative that could fully accommodate his religious beliefs while preserving prison safety and security. The defendants did not violate the plaintiff's First Amendment rights.

## C. The Plaintiff's Equal Protection Claim

The plaintiff has failed to make a triable discrimination claim. When prison officials apply a grooming regulation differently in relation to different groups, the disparate treatment may violate the Equal Protection Clause. *Reed v. Faulkner*, 842 F.2d 960, 964 (7th Cir. 1988). In *Reed*, a Rastafarian inmate brought suit against prison officials, charging that they had infringed his religious liberty and deprived him of equal protection of law. The plaintiff claimed that correctional officials enforced against him a prison regulation forbidding male inmates to wear their hair so long that it touched their collar, while not enforcing the regulation against American Indians.

In the case at bar, although the plaintiff contends that Rastafarians are singled out for the grooming policy, he has failed to submit sufficient evidence to create a

triable issue of fact. The plaintiff has identified only one other inmate with dreadlocks whose hair was cut pursuant to the grooming policy; he names only two inmates whose hair was **not** cut, and one of those two inmates was a Rastafarian. Furthermore, the IDOC's website reflects that both inmates in question now sport very close-cropped hair. *Compare Moore-Bey v. Cohn*, 69 Fed. Appx. 784, 788 (7th Cir. 2003) (summary judgment in favor of prison officials was appropriate because there was no showing that prison officials lacked a compelling interest for hair cuts and there was no dispute that all new arrivals at the facility in question were shorn to thwart the introduction of parasites and hidden weapons or contraband into the facility). The plaintiff's own evidence suggests that the grooming policy was implemented sloppily, perhaps, but not in a discriminatory manner.

It is irrelevant that the plaintiff was allowed to maintain dreadlocks at the Hill Correctional Center, a medium security facility. The Constitution does not insist that prison policies be implemented with perfect regularity; rather, prison officials cannot deviate for illegitimate reasons. *Russel v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004). The court can envisage many reasons why matted dreadlocks are considered more of a threat than long, straight hair or even an afro; in any case, the grooming policy seems to be applied to all inmates-even if in stages and somewhat haphazardly-and not just Rastafarians. The plaintiff has failed to adduce sufficient evidence for the matter to go to a jury.

## D. Qualified Immunity

Finally, even assuming *arguendo* that the plaintiff did have a right to maintain dreadlocks, the court is satisfied that the defendants are entitled to qualified immunity because that right is not presently "clearly established." Under the doctrine of qualified immunity, state officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To evaluate a claim of qualified immunity, the court must engage in a two-step analysis. First, the court determines whether the plaintiff's claim states a violation of his constitutional rights. The court then determines whether those rights were clearly established at the time the alleged violation occurred. *See Wilson*, 526 U.S. at 609; *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008). Only if the rights were clearly established may the official be liable for monetary damages. *See Richardson v. McKnight*, 521 U.S. 399, 403 (1997); *Koger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008).

Although it is well established that the plaintiff has certain religious protections under the First Amendment and RLUIPA, he has not demonstrated that he had a clearly established right to maintain dreadlocks. In *Koger*, an inmate requested a meat-free diet for religious reasons. The U.S. Court of Appeals for the Seventh Circuit rejected prison officials' qualified immunity defense, holding that it was clearly established by prior case law that inmates seeking vegetarian meals did not have to meet a religious

17

requirement or clergy certification test. *Koger*, 523 F.3d at 803. In the case at bar, in contrast, there is no controlling precedent in the plaintiff's favor. Quite the reverse: the cases in this circuit that have gone to summary judgment or trial all seem to have resulted in judgment for prison officials. Hence, the defendants are entitled to qualified immunity, irrespective of whether case law or statutes ultimately invalidate grooming policies such as the one at issue here. As the plaintiff no longer has standing to sue for injunctive relief and the defendants are immune from damages, the plaintiff's case cannot proceed.

## CONCLUSION

For all of the foregoing reasons, the plaintiff's motion to reply [#91] to the defendants' motion for summary judgment is granted. However, the defendants' motion for summary judgment [#70] is granted. The clerk is directed to enter summary judgment in favor of the defendants pursuant to Fed. R. Civ. P. 56. The case is terminated.

Enter: *[signature: Charles Ronald Norgle]*

CHARLES R. NORGLE
United States District Judge

Date: May 21, 2010